IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DESHAWN FISHER, et al.,                    *

    Plaintiffs,                        *

    v.                                 *          CIVIL NO. JKB-24-1135

PENNSYLVANIA NATIONAL MUTUAL               *
CASUALTY INSURANCE COMPANY,
                                           *
    Defendant.
                                           *

  *    *    *    *    *    *    *    *    *    *    *    *    *

## MEMORANDUM

Pending before the Court are Motions for Summary Judgment filed by Plaintiff Deshawn Fisher (ECF No. 64) and Defendant Pennsylvania National Mutual Casualty Insurance Company ("Penn National") (ECF No. 85). The Motions have been fully briefed (*see* ECF Nos. 65, 82, 86, 87, 88) and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2023). For the reasons set forth below, the Court will deny Plaintiff Fisher's Motion and grant Defendant Penn National's Motion.

## I.    Background

The Court has previously described the factual background and procedural history of this case as follows:

> In this action, Plaintiff Fisher seeks to require Defendant [Penn National] to indemnify its insureds, Realigned Plaintiffs Jacob Dackman & Sons, LLC ("Dackman & Sons") and Elliott Dackman (collectively, the "Dackman parties"), for damages that were awarded to Fisher in a state court judgment against the Dackman parties in 2019. (*See generally* ECF No. 44.)
>
> From August 1993 to May 1995, Fisher resided at or visited 1723 Montpelier Street— one among a significant number of residential properties in Baltimore City that were owned and operated by Dackman & Sons. (*Id.* ¶¶ 6, 18.) Fisher filed a civil action against the Dackman parties and other defendants in the Circuit Court for Baltimore City on July 5, 2017, alleging injuries resulting from his exposure to lead-based paint

at 1723 Montpelier Street. (*Id.* ¶ 18.) After a jury trial, on September 12, 2019, the court entered a judgment in favor of Fisher and against the Dackman parties in the amount of $2,212,874 (the "Tort Judgment"). (*Id.* ¶ 21.) No part of the Tort Judgment has been satisfied. (*Id.* ¶ 26.)

From June 1991 to August 1997, the Dackman parties were insured by Penn National under a commercial general liability policy with a $1,000,000 aggregate limit. (*Id.* ¶¶ 10–11.) Fisher alleges that throughout this period, the policy included a "per location endorsement" amending the aggregate limit "such that $1,000,000 in coverage applied separately to each location owned or rented by" the Dackman parties. (*Id.* ¶¶ 10–13.) Penn National agrees as to the 1991–92, 1992–93, 1996–97, and 1997 policy years (the "Uncontested Policy Years"), but claims that in the 1993–94, 1994–95, and 1995–96 policy years (the "Contested Policy Years"), the policy did *not* include a per location endorsement and the aggregate limits applicable to these policy years have been exhausted. (*Id.* ¶ 27.)

Fisher filed the instant action in the Circuit Court for Baltimore City on March 1, 2024, seeking a declaratory judgment that the per location endorsement applied during the Contested Policy Years. (ECF No. 3 ¶¶ 32–35.) Penn National removed to this Court based on diversity jurisdiction. (ECF No. 1 ¶¶ 7–10.) Fisher amended his Complaint on October 3, 2024, adding a breach of contract claim . . . . (ECF No. 44 ¶¶ 36–43.)

(ECF No. 80 at 1–2.)

Defendant Penn National's Motion for Summary Judgment argues that it is entitled to judgment as a matter of law for three reasons. First, the undisputed facts establish that the per location endorsement was not a part of the policy during the Contested Policy Years and Penn National therefore has not breached its contract; second, Plaintiff has waived, and lacks standing to assert, any claim for reformation of the policies; and third, Plaintiff's claims are untimely. (ECF No. 85-1 at 7–8.) Plaintiff's Motion for Summary Judgment argues that even if Penn National excluded the per location endorsement from the policy during the Contested Policy Years, "such a modification was invalid and now is unenforceable" because the undisputed facts establish that this change "was undertaken without adequate notice and unsupported by necessary consideration." (ECF No. 65 at 6.)

2

## II.   Legal Standards

To prevail on a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56, the movant must show that there is no genuine dispute as to any material fact and that she is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  In proving the presence or absence of a genuine dispute, either party may point to materials in the record, such as admissions, stipulations, depositions, documents, and electronically stored information.  Fed. R. Civ. P. 56(c). The moving party has the burden of demonstrating the absence of any genuine dispute of material fact.  *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970).  If the movant meets this burden, then the nonmoving party cannot rest on mere denials but must point to specific facts showing there is a genuine triable issue in the case.  *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003).  In determining whether a genuine dispute exists, the Court views the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986); *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam).

Where the parties have filed cross motions for summary judgment, the court must consider each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law.  *Allstate Ins. Co. v. Rochkind*, 381 F. Supp. 3d 488, 507 (D. Md. 2019) (citation omitted).  Simply because both parties have filed for summary judgment does not mean that summary judgment to one party or another is necessarily appropriate.  *Id.*

## III.   Analysis

### A.   Whether the Per Location Endorsement Was Part of the Policy in the Contested Years

Even viewing the evidence in the light most favorable to Fisher, no fair-minded jury could find that Fisher has met his burden under Maryland law to establish that the per location endorsement was part of the policy in the Contested Policy Years.  Penn National has moved for

summary judgment on this basis (ECF No. 85-1 at 10–14) and the Court will grant it.

### 1. Uncontested Facts

Many pertinent facts are uncontested. The parties agree that there was a per location endorsement, Form CG2504, included in the 1991–92 policy issued by Penn National to the Dackman parties, which provided that "[t]he General Aggregate Limit . . . applies separately to each of your 'locations' owned by or rented to you." (*See* ECF Nos. 86 at 9; 82 at 10; 64-10 at 15.) There is no dispute that the endorsement also applied to the 1992–93 renewed policy: although the declarations page of the renewed policy did not list Form CG2504, the omission was brought to Penn National's attention, and Penn National subsequently issued written policy change endorsement stating "Form CG2504 is added as per attached." (*See* ECF No. 86 at 10; 82 at 10; 64-17; 65-2; 65-3.)

As to the three Contested Policy Years (1993–94, 1994–95, 1995–96), the parties agree that Form CG2504 was not listed on the declaration pages of the renewed policies. (*See* ECF Nos. 86 at 10–11; 82 at 11–12; 64-19, 64-25, 64-29.) There is no dispute that upon receipt of the 1993–94 policy, one of the Dackman parties' brokers requested that Penn National add the per location endorsement. (*See* ECF No. 82 at 11; 86 at 11; 65-4.) However, the parties agree further that "[t]here is no documentation of any reply or action by Penn National" after this request was made—no policy change endorsement like the one issued for the 1992–93 policy, nor any other writing, exists in the record to show whether Penn National made the requested change, and no testimony is cited claiming a recollection of such writing having existed in the past. (ECF No. 86 at 11; *see also* ECF Nos. 82 at 11; 82-3 at 5.) The parties agree that the 1994–95 and 1995–96 policies were issued on like terms as the 1993–94 policy. (ECF Nos. 86 at 11; 82 at 12; 64-31.)

Further, there is no dispute that among the "common policy conditions" that were applicable from the first 1991–92 policy and continuing through the Contested Policy Years was a provision

stating: "This policy contains all the agreements between you and us concerning the insurance afforded. . . . This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy." (ECF Nos. 85-1 at 10; 64-10 at 18.)

### 2. Fisher's Arguments

Fisher argues that despite these facts, additional evidence exists from which a reasonable jury could conclude that the per location endorsement nevertheless applied as part of the policy during the Contested Policy Years. (*See* ECF No. 86 at 18–23.) Primarily, Fisher argues that because these policies were renewal policies, Fisher was entitled to the same coverage as was provided by the expiring policy unless Penn National provided specific, conspicuous, and unambiguous notice of the change, which Fisher contends it did not. (*See, e.g., id.* at 20.) Although his briefing is somewhat unclear, Fisher seems to press two arguments. As discussed further below, his primary theory is that even if no written endorsement adding CG2504 was added in the Contested Policy Years, and even in the face of the policy language requiring that "terms can be amended only by endorsement," the Court should still hold that the terms of the CG2504 applied in the Contested Years because Penn National failed to provide adequate notice and consideration concerning the change. But insofar as Fisher intends to argue in the alternative that a reasonable jury could *infer* that a written endorsement adding CG2504 to the 1993–94 policy *did* issue (despite not having been found and included in the record of this litigation), the main facts that he summons in his favor are as follows.

There was no significant reduction in the premium the Dackman parties were required to pay for the policy when Penn National alleges the per location endorsement was dropped, even though the change would reduce primary coverage limits from roughly $1 billion to $1 million. (*See* ECF No. 86 at 20–21 (without any citation to record evidence).) Further, a distinct form listed on the 1993–94 policy's declarations page, Form 702720, fails to list removal of the per location

endorsement as among the "Reductions in Coverage" that were effectuated that year. (*See id.*; ECF Nos. 64-19, 64-22.) Also, Dackman maintained a copy of Form CG2504, the per location endorsement, in his personal file for the 1993–94 policy. (*See* ECF Nos. 86 at 22, 86-2 at 13–19, 65-10.) And finally, "Penn National [made] payments well in excess of the alleged $1 million limit of primary coverage under a Contested Policy, settle[d] a lead paint claim involving the same subject property, and [for] a decade pa[id] for attorney fees and defense costs." (ECF No. 86 at 22 (without any citation to record evidence).)

Fisher's Opposition to Penn National's Motion for Summary Judgment (ECF No. 86) fails to discuss an additional factual allegation that is discussed in Fisher's Motion for Summary Judgment (ECF No. 65). Namely, Fisher asserts that when the Dackman parties' broker asked Penn National to add CG2504 after noticing it was absent from the 1993–94 declarations page, a Penn National employee responded orally that they would add it. (*Id.* at 11.) Fisher provides an affidavit from the Dackman parties' broker, A. Murray Slattery, attesting to this conversation— "Although I do not recall receiving a written response to my [request], I spoke with Sandra in [Penn National's] office who indicated they 'were working on it and would be sure to add it.'" (ECF No. 64-1 ¶ 11.) "The best and most coherent explanation of these facts and circumstances," Fisher argues, "is that the per location endorsement was renewed in June 1993 along with the other terms and conditions of the Dackman policy." (ECF No. 86 at 23.)

### 3.  Legal Standards

Insofar as Fisher seeks to establish that CG2504 was part of the written policy in the Contested Policy Years, his argument is, in effect, that part of the written contract has been lost. Under Maryland law, the burden on a party seeking coverage under a lost or missing insurance policy is high. As the Fourth Circuit has explained:

> The proponent of an original writing . . . typically must produce the writing to prove its contents. But if the original is lost or destroyed in good faith, other evidence of the

6

writing's content is admissible. As with all other issues of fact, the trier of fact determines whether the asserted original ever existed and whether the other evidence accurately reflects the original's contents.

Because the instant case is a diversity dispute between alleged parties to an insurance contract, Maryland law governs as to the burden of proof [that the party seeking coverage] must meet. In Maryland, the proponent of a lost insurance policy must establish the fact of loss and the terms and conditions of the policies **by "clear and positive" evidence**.

Maryland courts have not yet clarified whether the "clear and positive" standard approximates the "mere preponderance" standard or the "clear and convincing" standard. Accordingly, federal courts in Maryland have sometimes chosen one standard and sometimes chosen the other. Rather than decide the standard's meaning, we proceed merely with the understanding that **[the proponent's] evidence must at least "leave no reasonable doubt" as to the existence and the terms and conditions of the insurance policy** he insists [the insurer] issued to him.

*Klopman v. Zurich Am. Ins. Co. of Ill.*, 233 F. Appx. 256, 258–59 (4th Cir. 2007) (quoting *Barranco v. Kostens*, 54 A.2d 326, 328 (Md. 1947) ("The evidence necessary to establish a lost instrument and to prove its contents must be clear and positive and of such a character as to leave no reasonable doubt as to its terms and conditions.")) (emphasis added and other citations omitted).

Penn National urges the Court to apply a "reasonable doubt" standard to Fisher's claims (ECF No. 88 at 10) and indeed, some federal courts in this District have done so. *See, e.g., Gen. Ins. Co. of Am. v. Walter E. Campbell Co., Inc.*, 241 F. Supp. 3d 578, 597 (D. Md. 2017) (requiring evidence that leaves no reasonable doubt as to the terms and conditions of the absent insurance policy). Other courts, however, have applied a lesser—though still heightened—standard. *See, e.g., Lowry's Reports, Inc. v. Legg Mason, Inc.*, 271 F. Supp. 2d 737, 757 n.3 (D. Md. 2003) (requiring "clear and convincing evidence"); *Klopman v. Zurich Am. Ins. Co.*, No. Civ. WDQ-04-2529, 2005 WL 1367080, at *2 n.4 (D. Md. June 7, 2005) (requiring "substantially more than a preponderance"). In *Dasher v. Ransom*, the Court of Special Appeals of Maryland recently discussed *Barranco*'s requirement to provide evidence that is "clear and positive and leave[s] no reasonable doubt" as to the existence and terms and conditions of a lost contract. No. 326, Sept.

7

Term, 2018, 2021 WL 3013352, at *5 (Md. Ct. Spec. App. July 15, 2021). The Court acknowledged that "[l]oose and confusing language abounds" in the Maryland caselaw, but it ultimately endorsed the existence of only three distinct evidentiary standards—proof by a preponderance of the evidence, proof by clear and convincing evidence, and proof beyond a reasonable doubt. *Id.* at *6–7. The Court held that under *Barranco*, the intermediate "clear and convincing" standard applies. *Id. Dasher*'s applicability here is not entirely clear, and the parties have not briefed it—among other things, unlike *Dasher,* this case does not concern the Statute of Frauds. Nevertheless, *Dasher* provides at least some reason to conclude that *Lowry's Reports* had it right and the "clear and convincing" standard, rather than the "no reasonable doubt" standard, applies.

The Court will not decide here which heightened standard applies under *Barranco* but will instead assess the facts under both the "clear and convincing" and "beyond a reasonable doubt" standards. By contrast, this Court finds no support for *Klopman*'s assertion that federal courts in Maryland have sometimes applied a "mere preponderance" standard. *See Klopman*, 233 F. Appx. at 258. While the cases *Klopman* cites have indeed described the standard they are applying in varied language, they all required more than just a preponderance of evidence. Indeed, the only cases of which this Court is aware that apply the "mere preponderance" standard are from other states and other Circuits. Thus, the Court will not apply the "mere preponderance" standard here.

### 4. Analysis

The critical question under *Klopman* and *Walter E. Campbell* is whether Fisher has presented evidence "of such a character as to leave no reasonable doubt" as to the terms and conditions of the 1993–94 policy. The Court concludes that he has not. Even viewing the facts Fisher identifies in the light that most favors him, any reasonable jury would be forced to conclude that there remains, at the very least, a reasonable doubt as to whether CG2504 was endorsed to the 1993–94

8

policy (and therefore to the 1994–95 and 1995–96 policies). So too under even a "clear and convincing" standard—at minimum, the evidence is sufficiently unclear to preclude a reasonable jury from finding in Fisher's favor.

For one thing, Penn National has identified evidence that strongly undermines the inferences Fisher encourages the finder of fact to draw. The Court notes three examples. First, Penn National discloses expert testimony from former Maryland Insurance Commissioner Kathleen A. Birrane explaining that the reason premiums did not drop after the per location endorsement was removed is that the endorsement had previously been offered "for no additional premium." (ECF No. 82-4 at 9.) This assessment is supported by contemporaneous writings showing that when Penn National initially *added* the per location endorsement in 1991, it did so without changing its previously quoted price (for a policy without the endorsement). (*Id.*) This makes sense, in Birrane's view, given the fact that in 1991 and 1992, Penn National believed the risk of lead paint liability was sufficiently low that adding the per location endorsement did not meaningfully change its exposure. (*Id.* at 9–10.) But this assessment changed in and around 1993, as is again reflected in contemporaneous documents Birrane reviewed—by then, "Penn National knew that it was wrong" in its previous risk assessment and "was considering adding a lead paint exclusion to all of its residential rental liability policies." (*Id.* at 10; *see also* ECF Nos. 82-3 at 9; 64-28 at 2, 4–5.) Though such an exclusion was not ultimately added until years later, Penn National's well-documented consideration of the exclusion reflects a changed risk assessment that also makes sense of the coverage and premiums Penn National asserts applied to the Dackman parties' policies.[1]

To be sure, Fisher cites one out-of-state case holding that a lack of reduction in premiums

---

[1] This changed risk assessment also explains, according to Birrane, why the 1996–97 and 1997 policies once again included a per location endorsement, again without a meaningful change in premiums—namely, those years' policies "were also issued with lead paint exclusions." (ECF No. 82-4 at 14.)

can support an inference that there was no reduction in coverage (ECF No. 86 at 21 (citing *Elson v. State Farm Fire & Cas. Co.,* 691 N.E.2d 807, 814 (Ill. 1998))), and as a general matter, the Court agrees. But as Penn National rightly responds, "in some cases, an insurer may reduce coverage without reducing premiums" for other reasons. (ECF No. 88 at 13 (citing *Rochkind,* 381 F. Supp. 3d at 516).) Penn National's expert testimony that Penn National did so here because it "belie[ved] that the change in limits did not reflect a change in risk" (ECF No. 82-4 at 10) substantially undermines the inference Fisher seeks to encourage based on the stability of the Dackman parties' premiums.

Second, Fisher's own exhibits substantially undermine his reliance on the fact that Dackman kept a copy of the per location endorsement in his folder for the 1993–94 policy. Indeed, the record suggests that there is reason to doubt whether Dackman's records accurately reflected that year's policy. For example, Penn National's corporate designee explained that if the CG2504 had been in issued in 1993–94, as it was in the previous year, it would *not* have been provided to Dackman in that year because "for renewals you would only receive what had changed." (ECF No. 86-2 at 13.) In addition, the evidence suggests that the copy of the CG2504 that Dackman had in his 1993–94 folder was a photocopy, whereas most other documents in that folder were originals, and that it was three-hole-punched, whereas most other documents in that folder were not. (*See id.*; ECF No. 65-10 at 2.) Again, the inference Fisher seeks to support is less than compelling.

Third, Fisher's reliance on the conversation Slattery alleges he had with Sandra in Penn National's office, in which she allegedly informed him she would add the per location endorsement to the 1993–94 policy, is problematic in several ways. Most critically, Penn National has persuaded the Court that any evidence of this conversation should be excluded pursuant to Federal Rule of Civil Procedure 37(c)(1), which prohibits a party from using, on a motion or at trial,

10

information that should have been disclosed in discovery. Penn National shows that Fisher failed to identify Sandra or her alleged conversation with Slattery in response to a host of interrogatories to which she and it were plainly responsive. (*See* ECF Nos. 85-1 at 17; 85-12.) For example, Fisher made no mention of Sandra's alleged statement that she would add the per location endorsement to the 1993–94 policy in response to Penn National's interrogatory requesting "all facts relating to the claim that a per location endorsement was included in the policy," nor to its interrogatory seeking the identities of "all persons who were involved with or have knowledge of the underwriting or renewal of the policies." (*Id.*) Even if Fisher may have had legitimate objections to such contention interrogatories, the Court agrees with Penn National that having never supplemented his answers to make any reference to Sandra or to this conversation precludes Fisher from relying on it here. *See Walter E. Campbell Co.*, 241 F. Supp. 3d at 598. Further, the Court reiterates Slattery's own admission that he has no recollection of any written endorsement following his alleged conversation with Sandra (ECF No. 64-1 ¶ 11), which any reasonable finder of fact would have to confront in assessing whether any such writing ever existed.[2]

Even if a jury were to credit Fisher's characterization of his evidence and draw the inferences he seeks to support, still, as a matter of law, reasonable doubt would remain as to whether the CG2504 were endorsed in the Contested Policy Years. There is no dispute that a written endorsement was the only way of amending the policy, that no written endorsement exists in the record, and that no testimony has been offered asserting that such a written endorsement ever existed. In light of Fisher's evidence as discussed above, these facts suffice, as a matter of law, to constitute reasonable doubt as to the issuance of the written endorsement.

---

[2] Further still, the Court finds it highly likely that if Slattery were to testify at trial, Penn National would succeed in introducing significant questions as to his credibility. Penn National shows that Slattery pled guilty to several counts of felony insurance fraud, which it claims demonstrates "a propensity for misrepresenting facts in connection with insurance matters." (ECF No. 82 at 17; *see also* ECF Nos. 82-5—82-11.) Without attempting to resolve questions of credibility at the summary judgment stage, the Court merely notes this additional issue with Fisher's reliance on Slattery's alleged conversation.

For the same reasons, Fisher cannot meet his burden under a "clear and convincing" standard either. It is possible, in the Court's view, that a reasonable jury could find in Fisher's favor under a "mere preponderance" standard of proof. But such a jury could not conclude, in light of the above, that Fisher's evidence was "clear and convincing." At a minimum, Penn National, in reliance on undisputed facts, has muddied the evidentiary water as to the existence and applicability of the written endorsement in the Contested Policy Years. Given this, Fisher cannot meet his burden and Penn National is entitled to summary judgment on the question of whether the per location endorsement was included in the Dackman parties' policy in those years.

**B.   Whether Penn National Provided Notice and Consideration for Excluding the Per Location Endorsement in the Contested Years**

As discussed above, Fisher also argues that the Court should find CG2504 to have been included among the terms and conditions of the Dackman parties' policies in the Contested Policy Years *even if* no written endorsement adding CG2504 was ever added, and even in the face of the policy language requiring that "terms can be amended only by endorsement." The terms of the endorsement still governed, according to Fisher, given the lack of adequate notice and consideration Penn National provided concerning the change when it was dropped. Penn National, by contrast, argues that adequate notice and consideration were provided. Both Penn National and Fisher have moved for summary judgment on these questions. (ECF Nos. 65 at 23–32; 85-1 at 10–14, 19–20.) The Court will deny Fisher's motion and grant Penn National's.

The most critical facts concerning notice and consideration have been discussed above. The Parties do not contest that when the Dackman parties received the 1993–94 declarations page—in the first of the Contested Policy Years—Dackman's broker, Slattery, took actual notice that CG2504 was not listed among the endorsements included in the policy. That awareness prompted Slattery's colleague to request that Penn National add the per location endorsement, and

all parties agree that there is no written record of this ever being done. Despite this, the Dackman parties continued paying their (substantially unchanged) premiums for several years thereafter.

### 1. Legal Standards

Maryland cases are clear that an insurance policy may be considered a "renewed" policy even though it contains new terms. *See Rochkind,* 381 F. Supp. 3d at 514. However, an insured is entitled to assume that the terms of a renewed policy have not changed unless the insurer provides proper notice of changes to the expiring policy. *See id.; Gov't Emps. Ins. Co. v. Ropka,* 536 A.2d 1214, 1223 (Md. Ct. Spec. App. 1988).[3] The rationale Maryland courts have adopted for this rule is as follows:

> When an insured purchases an original policy of insurance he may be expected to read it and the law may fairly impose upon him such restrictions, conditions and limitations as the average insured would ascertain from such reading. However, where the stated period of coverage in the original policy is about to expire and the insurance company simply sends a renewal policy for the new period of coverage, the insured, in all likelihood, will not read it over again and may not fairly be expected to do so.

*Id.* (quoting *Bauman v. Royal Indemnity Co.,* 174 A.2d 585, 591–92 (N.J. 1961)). In other words, the purpose of the requirement that insurers provide notice of changes in a renewal policy is "assuring mutual assent." *See Ben Lewis Plumbing, Heating, & Air Conditioning, Inc. v. Liberty Mut. Ins. Co.,* 731 A.2d 904, 915 (Md. 1999) (quoting *J.A.M. Assoc. of Balt. v. W. World Ins. Co., Inc.,* 622 A.2d 818, 822–23 (Md. Ct. Spec. App. 1993)).

The *Ropka* Court noted "a dearth of authority . . . to determine what sort of notice is adequate to apprise the insured of a change contained in the renewal policy," 536 A.2d at 1223, though subsequently decided cases provide some additional guidance. In *Benner v. Nationwide Mutual*

---

[3] In addition to this common law notice requirement, Maryland law provides a statutory notice requirement as well, as explicated in the Code of Maryland Regulations. *See Cigna Prop. & Cas. Cos. v. Zeitler,* 730 A.2d 248, 262 (Md. Ct. Spec. App. 1999). Because Fisher is clear that he intends to invoke only the common law requirement (*see* ECF No. 65 at 28 n.38), the Court will not analyze the statutory requirement. The Court notes Penn National's remark that it "questions whether common law notice still exists in light of the COMAR regulations" (ECF No. 82 at 27 n.37), but because the Court agrees that the common law notice requirements have been satisfied here, the Court will not address the argument here.

*Insurance Company,* for example, the Fourth Circuit required that the changes be noted "under a conspicuous heading on the declaration pages or by separate endorsement mailed with the premium notice." 93 F.3d 1228, 1236 (4th Cir. 1996). In *Nationwide Mutual Fire Insurance Co. v. Mekiliesky,* Judge Young summarized that "courts will look for a short, separately attached, and boldly worded modification," noting that a mere "reference to [an] endorsement with an asterisk on [a] renewal declaration by itself does not provide sufficient notice under Maryland law." 976 F. Supp. 351, 354 (D. Md. 1997) (citation omitted), *aff'd,* 161 F.3d 3 (4th Cir. 1998). In *J.A.M. Associates,* the Court of Special Appeals of Maryland relied on an insurance agent's actual knowledge of changes to the policy in finding Maryland's common law notice requirement to have been met. 622 A.2d at 822–23. And in *Ben Lewis Plumbing,* the Court of Appeals of Maryland found that where an insured had actual notice of a change, the assumption of continuity of terms that would ordinarily be reasonable for an insured to make about a renewal policy was negated. 731 A.2d at 915.

Concerning the consideration that is required for a change in a renewed insurance policy, Judge Hollander has summarized the applicable principles as follows:

> When an insurer renews an insurance policy, the original policy premium generally will not be considered the needed additional consideration for a new restrictive endorsement. And, where there has been no reduction in premium as consideration for an exclusion clause reducing the coverage contracted for in the original policy, the exclusion clause may be invalid for lack of adequate consideration. Therefore, if it can be shown . . . that the insured received less coverage than that for which he paid for the original policy and if there was no consideration for the reduction, the attempted policy modification should be invalid for lack of consideration.
>
> However, in some cases, an insurer may reduce coverage without reducing premiums, yet still provide adequate consideration. A decrease in premium owing to a decrease in coverage can be completely obliterated by a rate increase that goes into effect at the same time. But, in cases where premiums remain flat or increase, the insurer must provide evidence that consideration was actually given. For example, in *Benner,* the insureds claimed they did not receive consideration after a policy renewal included a coverage reduction yet premiums increased 4.3%. But, the insurer provided evidence, including testimony from an employee, that but for the coverage reduction, the insurer would have increased premiums by 6.7%. As a result, the Fourth Circuit concluded

14

that the insurer's evidence was sufficient to support the jury's conclusion that merely foregoing the opportunity to seek a greater increase constitutes valid consideration.

*Rochkind*, 381 F. Supp. 3d at 516 (cleaned up, citations omitted); *see also Benner*, 93 F.3d at 1238–39 ("[W]hen terms are changed in a renewal policy, Maryland law requires both proper notice and valid consideration, but not additional consideration. . . . [A]n attempted policy modification should be voided for lack of consideration if the insured can show that he received less coverage than was commensurate with the amount he paid.").

### 2. Analysis

Reasonable jurors confronted with the undisputed evidence presented in the parties' motions would be forced to conclude that the Dackman parties were given adequate notice and consideration for the change in policy that was effectuated by the 1993–94 removal of the per location endorsement. The Court will therefore grant Penn National's motion and deny Fisher's Motion on these points.[4]

As in *J.A.M. Associates* and *Ben Lewis Plumbing*, the Court finds Slattery's admitted actual knowledge of the change in terms to be dispositive of the adequacy of the notice provided here. This is because actual knowledge of the change clearly suffices to "assure mutual assent"—the very purpose the notice requirement is meant to serve. In other words, the Dackman parties were clearly *not* entitled to assume, as the common law holds they would be without any notice, that there were no changes at all to the renewal policy—Fisher admits that their broker was aware of the relevant change.

Fisher argues that when Slattery's coworker requested that Penn National add back in the

---

[4] Penn National also argues in the alternative that Fisher has no right to assert the notice and consideration claims, which belong to the Dackman parties alone. (*See* ECF No. 82 at 24–25 ("[A]ny duty the insurer owed to the insured to notify of policy changes ran only to the insured, namely Dackman, and not to a subsequent tort claimant like Fisher. . . . Fisher may not, as a matter of law, pursue his claims for reformation and/or notice and/or lack of consideration for a reduction in coverage.").) Because the Court concludes that Fisher cannot meet his burden on the substance of the notice and consideration claims, the Court declines to evaluate this alternative argument.

15

CG2504 to the 1993–94 policy, the request constituted "a warning signal to Penn National that its insureds expected the same terms and conditions of the expiring policy to be included in the renewed policy." (ECF No. 87 at 7.)  But any such expectation was, by that point, patently unreasonable because the Dackman parties, through their brokers, had been explicitly informed that the written terms of the policy govern, and that the policy as written did not include the per location endorsement.  Their request to add the endorsement back in was necessary exactly because they were aware that it was *not* included, and only if they had reason to think their request was subsequently honored would it have been reasonable to assume that the prior year's terms continued to govern.  But as discussed above, Fisher cannot meet his burden to show that the request to add CG2504 back into the 1993–94 policy was in fact ever honored.

As to the adequacy of consideration, so too the Court finds that no reasonable jury could find in Fisher's favor in light of the undisputed evidence.  Fisher's argument about consideration rests entirely on the lack of change in premiums between 1992–93, when CG2504 was admittedly included in the policy, and 1993–94, when it was not. (ECF No. 65 at 30–32.)  While indeed "[i]t is incontrovertible that an enormous reduction of coverage resulted from Penn National's asserted elimination of the per location endorsement [and that the] policy premiums paid by Dackman . . . were unaffected by Penn National's modification" (*id.* at 31), this is far from sufficient evidence that there was no consideration for omission of the endorsement in the 1993–94 policy.  As explained in *Rochkind* and *Benner*, the showing Fisher would be required to make to prevail on this issue is not that there was no change in premiums, *per se*, but rather that the Dackman parties "received less coverage than was commensurate with the amount [they] paid." *Benner*, 93 F.3d at 1238–39.  Indeed, other changes in circumstances, such as a simultaneous rate increase, can explain a change in coverage without a change in premiums. *Rochkind*, 381 F. Supp. 3d at 516 ("[I]n some cases, an insurer may reduce coverage without reducing premiums, yet still provide

16

adequate consideration.").

To be sure, given the lack of change in premiums, it is incumbent upon Penn National to produce evidence that there was indeed adequate consideration provided for the 1993–94 policy it issued. *Id.* The Court finds, though, that Penn National has provided sufficient undisputed evidence to make this showing. In particular, there is ample evidence in the record, primarily in the form of Ms. Birrane's expert report, that it was the 1991-92 and 1992-93 policy years when a mismatch between coverage and premiums existed, and in the Dackman parties' favor—during those years, Penn National drastically underestimated the value of the per location endorsement and offered it for no additional premium. (*See* ECF No. 82-4 at 9–11.) That Penn National then corrected its error was therefore no failure of consideration. In his briefing and the exhibits attached thereto, Fisher fails to rebut the testimonial evidence provided by Ms. Birrane in any way, and he does not argue that the premiums for the 1993–94 policy were unlawful for any other reason. Without any evidence in the record undercutting Ms. Birrane's interpretation of Penn National's changing risk assessment and resulting behavior, a jury would have inadequate evidentiary support for a conclusion that the Dackman parties received less coverage than was commensurate with their premiums. Thus, the Court will deny Fisher's motion on these grounds and grant Penn National's.[5]

## IV. Conclusion

For the foregoing reasons, Fisher's Motion for Summary Judgment (ECF No. 64) will be denied, and Penn National's Cross Motion for Summary Judgment (ECF No. 85) will be granted. A separate Order will issue.

---

[5] Having ruled on the substance of the parties' claims, the Court need not reach Penn National's arguments that Fisher's claims are time-barred. (*See* ECF No. 85-1 at 20–27.)

17

DATED this 26 day of March, 2026.

BY THE COURT:

_James K. Bredar_
James K. Bredar
United States District Judge